John McKAY, Appellant–Respondent,

v.

Stephanie McKAY, Appellee–Petitioner.

No. 34A05–9402–CV–60.

Court of Appeals of Indiana,
First District.

Dec. 13, 1994.

Mark A. Ryan, Kokomo, for appellant.

## OPINION

ROBERTSON, Judge.

John McKay [Father] appeals the divorce court's order requiring him to pay sums directly to his son, Joel, for his college expenses entered on the modification petition of Stephanie Cooke [Mother]. Father raises one issue upon which we reverse. Restated, it is:

Whether Father has demonstrated prima facie reversible error in the trial court's order requiring him to pay a portion of Joel's college expenses when Joel, an adult, has steadfastly refused to have any relationship with Father despite Father's ongoing efforts to reconcile their relationship?

## FACTS

The facts in the light most favorable to the trial court's judgment reveal that Father and Mother had been married for approximately sixteen years when they divorced in 1984. Mother was awarded custody of the three children, all boys, John, Joel, and Justin.

Father was awarded reasonable visitation and ordered to pay child support. At the time of the hearing in this matter, John was in his early twenties and had been emancipated; Joel was twenty years-old, a junior at Indiana University—Bloomington; and Justin was sixteen years-old, a junior in high school and living with Mother. As noted above, the only issue involved in this case relates to the order regarding the payment of Joel's college expenses.

The relationships between Father and Mother, and Father and the sons, were severely damaged as a result of the divorce and continued to deteriorate in the years that followed. Father had exercised visitation with the boys from 1984 to 1987. However, in 1987, the acrimony had intensified to the point where Father voluntarily relinquished his rights of visitation. Father admits the deterioration in the relationships was at least partly his fault. Since 1987, Father has not exercised visitation with the boys but has sporadically sent them cards and gifts.

In 1990, Father began treatment for depression resulting from his alienation from his children. In August of 1991, Father attempted a reconciliation with the boys, who were not interested in reestablishing a relationship with Father. When informal efforts failed, Father filed a petition to enforce his visitation rights with the two younger boys. The trial court held a hearing, interviewed the boys in chambers, and ordered them to participate in a number of counseling sessions designed to effect a reconciliation. After completing the required counseling, the boys refused to visit with Father.

Joel started college at Indiana University—Kokomo, where he could live at home with Mother. Then without consulting Father, Joel transferred to Indiana University—Bloomington and pledged a fraternity. As Joel was no longer living at home, the expenses related to his college education increased substantially. Both parents filed petitions for modification of the child support/educational expenses order and the petitions were joined in the present litigation. Father again requested enforcement of his visitation rights.

At trial, Joel testified that he was electing not to have a relationship with Father, that he did not want a relationship or contact with Father, and there was nothing that could be done to change his mind. Joel referred to Mother and his step-father as his "parents" with whom he consults regarding his college-related decisions.

Father testified that Joel was coming of age, a man, and old enough to make his own decisions. Father stated his belief that it would be very unfair to require him to contribute toward Joel's college education when Joel refused to have any relationship with him and that, under the circumstances, Father did not feel obligated to assist Joel with his college education. Father testified further that, if Joel were willing to reestablish a relationship with him, he would feel responsible to do whatever he could to help put Joel through college.

The trial court denied Father's petition to have his visitation rights enforced. The trial court granted Mother's petition and ordered Father to pay $150.00 per month directly to Joel during the school year for his college room and board expenses.

## DECISION

First, we acknowledge that Mother has declined to file an appellee's brief, and therefore, Father need show only prima facie reversible error to be successful in this appeal. *Sterrett v. Hartzell* (1994), Ind.App., 640 N.E.2d 74. We may reverse the trial court's decision if error appears on the face of the argument. *Id.*

Under Indiana law, there is no absolute legal duty on the part of parents to provide a college education for their children. *Neudecker v. Neudecker* (1991), Ind., 577 N.E.2d 960, 962. However, the statutory authorization for the divorce court to order either or both parents to pay sums toward their child's college education constitutes a reasonable manner in which to enforce the expectation that most families would encourage their qualified children to pursue a college education consistent with individual family values. *Id.* In determining whether to order either or both parents to pay sums toward their child's college education, the court must consider whether and to what extent the parents, if still married, would have contributed to the child's college expenses. *Id.;* Ind.Child Support Guideline 3 (Commentary 3.b.).

In *Isler v. Isler* (1981), Ind.App., 422 N.E.2d 416, we held a nineteen year-old child to have been emancipated when he had chosen to remove himself from his father's custody and control in order to escape domestic discipline or parental restraint. In *Green v. Green* (1983), Ind.App., 447 N.E.2d 605, *trans. denied,* we noted that the salient feature of emancipation freeing a child from the care, custody, and control of his parent for the remainder of the child's minority is that the child has created a new relationship between himself and his parent, relieving the parent from the responsibilities of support.

The approach adopted by the Pennsylvania courts when confronted by the precise issue posed in the present case is most persuasive. In *Milne v. Milne* (1989), 383 Pa.Super. 177, 556 A.2d 854, 856, the court held that where a child, as an adult over eighteen years of age, repudiates a parent, that parent must be allowed to dictate what effect this will have on his or her contribution to college expenses for that child. In reaching this decision, the *Milne* court noted that:

> The objective of the court [in] extending its protection to adult children of divorced parents is to ensure that they are not unjustly—and that is the key word—deprived of opportunities they would otherwise have had, had their parents not divorced....

In an intact family, there is mutual discussion of the desired choice of school and the affordability of the choice. Parents exercise some control over the adult child by virtue of their provision of financial support. Yet we routinely impose the obligation of educational support for children of divorced parents without making allowance for any input on the part of the noncustodial parent. This differential treatment is justified on the basis that, because of the divorce, the welfare of those children is the responsibility of the courts and that there is a legitimate interest of

the state at stake such that the differential treatment is rational, in constitutional parlance. [See *Neudecker,* 577 N.E.2d at 962] ... However, to the extent that the courts of this Commonwealth impose obligations on divorced parents without expecting commensurate responsibilities and respect from adult children, we add to the family's problems rather than alleviate them. Any time one member's interests are elevated over the unit's interest, especially when this is done without any quid pro quo, the already damaged family unit is dealt another blow.

We must realize that, by allowing them to rely on the courts to settle such disputes, we deprive families of the opportunity to work out their problems and be the shapers of their own destinies. To the extent that we usurp the natural functions of the family unit—including handling fallings out—we put an obstacle in the path of reconciliation rather than removing one. By acting as we do, we assume the responsibility for the decisions that would be made entirely internally in a family if it were still intact. [*See Lamb v. Wenning* (1992), Ind.App., 591 N.E.2d 1031, 1033 (The judiciary should be extremely reluctant to substitute its judgment for that of parents in the area of raising children), *transfer granted on other grounds,* 600 N.E.2d 96.] If warring family members can blame the court, they will be less likely to recognize and acknowledge their own culpability. Without a feeling of responsibility for, or participation in, either the decision or the result, there is less incentive for the individual family members to improve relations.

\*    \*    \*    \*    \*    \*

Of course, unless we were divorced parents, the manner in which we made those decisions [regarding whether to pay towards an adult child's college education] would be entirely up to us and outside the purview of the courts. If we felt that, so long as an adult child's willful estrangement continued, he or she would receive no monetary support from us, that decision would be unappealable. Karen Milne feels

that way; however, her choice is open to question because she is divorced.

\*    \*    \*    \*    \*    \*

The value of a college education must be balanced with the traditional family values that have been central to that unit long before a college education was desirable or even possible for most families.

\*    \*    \*    \*    \*    \*

We will not provide [a child who has repudiated his parent] with the means of inflicting yet another blow to a parent who has already suffered the deeply painful rejection of his or her child. Just as divorcing parents run the risk of alienating their children, adult children who willfully abandon a parent must be deemed to have run the risk that such a parent may not be willing to underwrite their educational pursuits. Such children, when faced with the answer 'no' to their requests, may decide to seek the funds elsewhere; some may decide that the time is ripe for reconciliation. They will not, in any event, be allowed to enlist the aid of the court in compelling that parent to support their educational efforts unless and until they demonstrate a minimum amount of respect and consideration for that parent.

556 A.2d at 859–866. The *Milne* court was careful to limit its decision to adult children, those over the eighteen years of age, holding:

> ... we certainly will not consider pre-majority attitudes and behavior, as we all recognize that the maturity and restraint which can be expected of adults is not appropriately applied to evaluate children. But to extend this parental amnesty beyond the age of majority would be irresponsible.
>
> By college age, children of divorced parents must be expected to begin to come to terms with the reality of their family's situation. They must begin to realize that their attitudes and actions are their individual responsibilities. Whatever their biases and resentments, while one can understand how they got that way, when they become adults it is no longer appropriate to allow them to stay that way without consequence. One of a parent's main

duties in raising a child is to teach him that he must take responsibility for his actions. The time-honored way in which this is accomplished is to make certain that the child deals with the natural consequences that follow from whatever course of action was chosen. Consider the lesson we are teaching if we allow adult children to use the powers of the state to force a parent whom they have [rejected] to contribute to their college education. This kind of message can hardly be considered one which is beneficial for the welfare of those children.

556 A.2d at 861, 862. The *Milne* court noted that other jurisdictions have adopted similar approaches to the problem presented when an adult child requests financial support from his or her divorced parent after having repudiated his or her relationship with that parent. *Riegler v. Riegler* (1976), 259 Ark. 203, 532 S.W.2d 734 (Arkansas); *Hambrick v. Prestwood* (1980), Miss., 382 So.2d 474 (Mississippi—the duty of a parent to send a child to college is not absolute and must ordinarily be earned by children through respect for their parents, love, affection and appreciation of parental efforts). *Cohen v. Schnepf* (1982), 115 Misc.2d 879, 454 N.Y.S.2d 785 (New York).

██ The approach taken by the Pennsylvania court in *Milne*, 556 A.2d 854, is appropriate, if not required, under Indiana law. As noted above, there is no absolute legal duty on the part of parents to provide a college education for their children and the divorce court, in determining whether to order either or both divorced parents to pay sums toward their child's college education, must consider whether and to what extent the parents, if still married, would have contributed to the child's college expenses. *Neudecker v. Neudecker*, 577 N.E.2d at 962. The expectation that a parent would ordinarily be inclined to contribute toward his child's college education (which may be enforced under our laws of dissolution) does not continue, and should not be enforced where an adult child has repudiated his relationship with his parent.

We are impressed with the rationale of the *Milne*, 556 A.2d 854, decision and adopt it in the present case. As outlined in more detail in the FACTS section, Joel, a twenty year-old adult, has repudiated his relationship with Father and has rejected Father's efforts to reconcile their relationship. Joel considers his mother and stepfather as his "parents" with whom he consults regarding his college-related decisions. Father has attempted a reconciliation with Joel and had sought the court's assistance in furtherance of this endeavor. Joel testified he had no interest in reestablishing a relationship with Father and nothing could be done to change his mind. All Joel wants from Father is money.

Since 1991, Father has stood with open arms to reestablish a father-son relationship with Joel. Joel, on the other hand, has rejected Father's invitation and has instead obtained a court order requiring Father to stand with outstretched, open wallet. Joel's repudiation of the father-son relationship has relieved Father of any further responsibility to contribute toward Joel's college education. *See Green*, 447 N.E.2d 605; *Isler*, 422 N.E.2d 416; *Milne*, 556 A.2d 854. Father has demonstrated prima facie reversible error.

Judgment reversed.

BAKER and FRIEDLANDER, JJ., concur.